May it please the Court, Jennifer Erickson-Bach on behalf of Appellant, Court Clearing. In the summer of 2015, Calissio engaged in a fraudulent scheme whereby it issued dividend ineligible shares in a way that made those shares indistinguishable from the others already existing in the market. The scheme was successful. Ultimately, Court Clearing's account was erroneously debited nearly $4 million. No party contends that Calissio actually paid dividends on the newly issued shares. How did Calissio or Carter profit from this? That's an excellent question, Your Honor. One, I think, core theory on this that we were never able to determine through discovery is they had announced a share buyback program prior to the announcement of the dividend, so the theory that Cora was working under was that they were buying back their own shares and collecting the dividend payments on the back end of the transaction. There's nothing in the record that actually, however, supports that. This morning I intend to address the following three topics. First, whether the brokerage defendants are entitled to protection for the receipt of the funds under Article 8 of the UCC. Second, the related question of whether the brokerage defendants are liable for conversion under Nebraska common law. And finally, whether summary judgment was proper on Cora's claim against SST, the transfer agent, for the fraudulent misrepresentation. Of course, I welcome the Court's questions on any topics. The brokerage defendants' contention that Article 8 of the UCC protects financial intermediaries who erroneously receive funds in a connection with a dividend that the issuer never paid cannot be squared with the plain language of that statute. Article 8 of the UCC creates a framework that supports the indirect holding system, a system in which securities transactions are settled through book entries rather than the physical transfer of stock certificates. A straight transfer of cash, which is what happened here when Cora's account was debited, is not entitled to the protections of the indirect holding system. We know that by looking at UCC 8.102.9, which provides the definition for a financial asset, and that's the protections that the brokerage defendants are claiming for Cora's adverse claim to the financial asset. We know specifically that the cash transferred out of Cora's account is not under 8.102.9 little sub 1, which applies only to securities, and that cash in connection with the due bill funds was clearly not a security. We also know in this case that it doesn't fall under 8.102.9 little sub 3, because in order to fall under that, you need an explicit agreement. Let's come at it the other way. What did Article 8 cover in this series of exchanges? It covered the underlying transfers of the Coliseo shares. Physically, from whom to whom? Throughout it would have covered initially the transfer. The newly issued shares were the result of a debt-to-equity conversion. The shares were created by the issuer, deposited into the accounts of the parties Nobilis and I think that transfer would have been covered. When the shares were subsequently sold during the interim period, I think those transactions were also covered under Article 8 of the UCC. When the purchasers from N and B, I call them, didn't get their dividends, who picked up the tab for that? Cora Claring. Pardon? Say your question again. When the purchasers... The purchasers thought they were buying freely traded shares. Correct. And they... They, at least in theory, paid for the expected dividends. It's an interesting question, Your Honor. The record shows that the stocks were trading during the interim period. What would you say they were sold for? They were sold, you know, under, below the value of the dividend, but then these were penny stocks. So that doesn't surprise me. I'm just asking, somebody bought stock thinking they were going to get a dividend, and they didn't get it. Well, actually... Who picked up the tab for that? What happened here is that the full amount of the dividend was debited out of Cora's account, transferred into the brokerage defendant's account, and according to the brokerage defendant's, then paid to the investors. The $3 million or the $300,000? That $3.7 million was debited out of Cora's account and ended up in the investors' hands. So I think they received certainly more than they were entitled to, but they received what Your Honor is characterizing as their expectation. So 11 cents was paid on over 500 million shares? Correct. Where'd the money come from? Cora. That's the $3.7 million we're trying to recover. Who? My client, Cora Clearing. So the way the due bills work, Cora is acting as the custodian for Nobilis and Beaufort's shares. So Coliseo issues the shares to Nobilis and Beaufort, Nobilis and Beaufort custody those shares with Cora Clearing. And then when the transaction goes through, it should have been Nobilis and Beaufort that get debited for it, but because it's in Cora's account, the debit goes to Cora first. Okay. So Cora can obviously look to Nobilis and Beaufort. Which it attempted to do, but there were insufficient funds to collect on that side. Coliseo, the issuer. They should have gotten the money from Coliseo, right? They should have gotten the money from Coliseo. They have absconded. The principal on that corporation was operating under a fictitious name. They got a default judgment as to the corporation, and I guess the president's probably somewhere in the Bahamas. Correct. But, um, so it's, it's, it's, we're now, we're now clawing away at the innocents here. Well, I, Cora would respectfully disagree with that characterization. We're looking in two directions. You've got the fraud issue as the SST, but that's not what, now you're just arguing the technicalities of Article VIII as to the broker-dealers who were clearly not people who should have been looked to to pick up the tab for this, if, whether it was innocent or fraudulent. Well, under Nebraska conversion law, um, which is what Cora believes applies here, uh, they absolutely meet the black letter definition of converting the funds. They took, um. Well, that's the issue. What? You call it black letter. That's the issue. Whether Nebraska law and conversion is, or, I think Nebraska law is a very easy answer. Whether this was, fit the, what you call the black letter definition. Of a conversion. Of a conversion. Um. Under Nebraska. I don't, I don't want to hear the argument on that. I'm not trying to. My position is.  If UCC Article VIII doesn't apply. I don't want to hear a plain language argument that somehow these, these due bills or whatever it is you're saying was a strictly cash transaction, and so it should be outside of Article VIII in a series of exchanges that are clearly within the contemplation of Article VIII strikes me as you're pushing a heavy rock uphill. I, I think there's. I'm trying to look for the practical virtues of your argument, and I'm not hearing any. I think first it, the notion that it's, uh, the transactions are within the purview of Article VIII is, is one that we would disagree with. When you look. I started by saying aren't there any of the, and you said sure there, sure there's this and there's this and there's this, but not this. Aren't you really arguing this, that, um, Article VIII does not apply. And because of Article VIII not applying, we're really dealing with Nebraska law. And at the end of the day, we're sitting with Nebraska law, which creates a conversion. Now under Nebraska law, when there's a conversion, there's a constructive trust in the corpus of the conversion. The corpus of the conversion now sits within the custody of the ultimate shareholders who got paid the dividend. But if you chase that back, you either got to grab it from those folks or you got to grab it from the, uh, security transfer agents, right? But whoever it is, these folks on this side are holding this property without any rightful ownership of it, right? And isn't their argument saying, hold on, wait a minute, stop. These are people that were purchasers in good faith for value. Nebraska constructive trust law does not really, is not going to be able to reach the corpus of these assets. And that therefore, judges, you got to decide, right? Now we can like decide that when Article VIII does in fact apply, then you have troubles. Or we could say it doesn't apply and then we're going to have to say to these folks, okay, now prove to us why constructive trust doesn't allow us under Nebraska conversion law to get there. Isn't that really what we're all here about? It is. And I think the direct answer to your honor's question, I would direct the court to UCC 8505, which talks about distributions from issuers. And that draws two distinct, two distinctions that I think are relevant here. First sub B, so 8505 sub B says that this securities, um, the entitlement holders are only entitled to distributions that the issuer actually pays, which didn't happen here. So I think that's reason number one, why this is very clear. It falls outside of the protections of Article VIII. The second thing happening in 8505 is if you go down to comment three and there, I think it draws another important distinction, which it says, even when the issuer pays a dividend, if it's a cash dividend, it's treated as a monetary obligation. Like any other monetary obligation, it's entitled, uh, the securities intermediary is entitled to take, for example, a right of, uh, set off against it. So that treatment of a monetary obligation stands in stark contrast to the other protections provided under Part VIII of Article VIII, where you see, um, the holder of a security entitlement, um, the securities intermediary doesn't have unfettered discretion to go in and take control of the securities entitlement. But here with the monetary obligation, they can do things like offset. Well, constantly under this Article VIII exception, uh, doesn't it just simply come down to you're saying it's nothing but money. Correct. The other side saying it's financial asset. Absolutely. Don't we have to make that decision? I think you do. And so that's why I think it's really important to start with the definition of financial asset. Um, and I think the only place where there's real debate as to whether this could be a financial asset is under 8109, or pardon me, 81029, little sub two. And what's happening there, um, Article VIII is, is describing the protections provided for the indirect holding system. And so they're trying to describe different types of investment products, both investment products that were in existence at the time of the drafting of Article VIII, but also those that could possibly be imagined to come into existence in the future. So they're looking at things like stocks and bonds and mutual funds, but also sort of more exotic investment products like derivatives, options, futures, uh, things that, that fall maybe outside the traditional definition of a security, but are nonetheless traded on markets. That's the sort of thing they want to provide. Those are the unique pieces of property that, um, it's very difficult to unwind a transaction on. Cash just doesn't fall within the definition of an investment product. It's not, uh, it's, it doesn't, uh, I think there's two categories. One is the obligation of a person. A straight debit of cash isn't an obligation of a person. The other side of it is a share participation or other interest in property or enterprise of a person. And cash also doesn't fall within there. This simply isn't the type of product that the system imagines, uh, would fall within the indirect holding system. I'd like to briefly- Is it a matter that the, that the cash is directly tied to an underlying, um, um, security? I don't think so. I think the transactions here are entirely separate. The transaction for the sale of the underlying share occurred at a different point in time. It concerned different subject matter, the share versus the money. And it was also deposited into different accounts. Um, and I would very briefly, um, say that on that score, I know there's a lot of debate about, uh, securities accounts versus settlement accounts, but one thing that's clear is if the court looks at the record, there's absolutely nothing in the record that says this cash was deposited into a securities account. Um, so I, I would absolutely make sure the court's aware of that. Um, the flip side of it, I think talking about the cash being, maybe the cash isn't a financial investment, which is I think where the district court went, or pardon me, not a financial asset, but rather a securities entitlement, um, for the reasons I just discussed, I don't think it actually can be characterized as a securities entitlement under 8505. But, um, even if it is, I don't think characterizing it as securities entitlement gets you all the way. The protections that the brokerage defendants are availing themselves of are specific to financial assets and not to securities entitlements. Um, the other thing that I would say there is that they look to 81029 to say that you can just interchange those two words, financial asset and securities entitlement, but that's not at all what 81029 says. It simply says that a securities entitlement may be evidence of a financial asset. That's talking about the language being used that a financial asset can be evidenced by a bookkeeping entry, but it doesn't say that a securities entitlement is a financial asset. So I think we have both the plain language of the statute supporting our interpretation as well as a common sense, uh, understanding of how these markets work and the protections, the scope of the protections that UCC Article 8 is really trying to convey for the indirect holding system. If there's no questions, I'll reserve my remaining 15 seconds for rebuttal. So is H&R Block wrong or distinguishable? H&R Block dealt with the transfer of securities, Your Honor, uh, and I'd be happy to, I've got my notes on H&R Block. Uh, yes, that was, they characterize it as $7 million, but the way that it actually appears in the case is that it was the transfer of 150,000 shares of stock with a net worth of approximately $7 million. So that was a security. That was one where the contested things . . . Well, I think it was an attempt to get back from the woman the money, the money she made when she sold the stock that she got by mistake. I'll have to take a look at that, Your Honor. Thank you. Thank you. Now, I think the claim against SST is taken on the brief, so I don't, are you SST or are you the broker? Your Honor, my name is Bill Hargens. I'm going to present argument on behalf of the four clearing firm defendants. I have . . . Can you just moment that for a moment? The four . . . What I call the broker defendants? Yes, sir. Mr. Bolivar is here representing Signature Stock Transfer . . . That issue wasn't argued. Well, I was going to reserve five . . . I assume that he can open up for rebuttal anything he wants to if he just says nothing. I'll defer to him on that. I did agree . . . The SST claim, the claims against SST are taken on the briefs, which is . . . I did agree to . . . . . . maybe or maybe not a good use of all your time. I did agree to reserve five minutes for him. If he doesn't want to take it, I'll be happy to use it. So, again, may it please the court, my name is Bill Hargens and I represent the four, as you referred to it, Judge Loken, broker defendants. We refer to them as the clearing firm defendants. In this case, Your Honor, the clearing firm defendants acting merely as intermediaries received no benefit when they received and allocated due bill credits to end customers who had purchased shares which, pursuant to FINRA and DTC procedures, had due bills attached to them. Because the clearing firm defendants received no benefit, there can be no claim for unjust enrichment because there's simply no enrichment. Because the clearing firm defendants acted as intermediaries, mere conduits, they did not have the dominion or control over the due bill credits which would support a claim for conversion under Nebraska law. Now, if the court agrees with us on those two propositions, then we don't need to reach the UCC provision issues, but if the court is inclined to consider them, we believe that both sections 8-502 and 8-115 apply, and as we just heard, really the only argument core advances in that regard is whether the due bill credits and or the cash in the account is a financial asset. I think it's important to stress, and I think this goes somewhat to Judge Erickson's question to counsel, who picks up the tab? Because that is really what we're talking about here, right? Who picks up the tab? Well, who should pick up the tab is who has picked up the tab. Who has picked up the tab? Because what CORE did, immediately upon learning of this alleged error, is they went in and they debited the accounts of Nobilis and Beaufort for a combined $1.4 million. Now, they got in an arbitration proceeding with Nobilis over that, but they won. Not only got that, plus another $2.2 million award. Now, as of the close of the record in the court below, the Beaufort issue was still in arbitration, but we did establish that they were making the same allegations against Beaufort as they were against Nobilis in the arbitration, which was they were guilty of a pump and dump scheme when they set this whole process in motion, which brings us before the court today. And in addition to that $1.4 million, they recovered from Darby, which was the introducing broker that put these shares on CORE's platform, $500,000 in cash, and got a promise to pay the $1.7 million. You add those up, that's the tab right there. I'm not going to touch on the unjust enrichment claim because counsel didn't even address it, and frankly, I wouldn't expect them to because there's just simply nothing there. So I'd like to focus on the conversion claim, and in particular, the question of dominion and control. Under Nebraska law, it's recognized in this circuit, in order to have a claim for conversion, there has to be a wrongful exercise of dominion and control over the property to which another has a right to immediate possession. As the Seventh Circuit teaches us in the bonded financial services case, which we discuss in some detail in our brief, in order to have dominion over funds, an intermediary has to have the ability to use those funds for its own purposes. As Judge Easterbrock said in that case, in order to have dominion, you have to be able to use the funds. In that case, he suggested to go buy lottery tickets or uranium stocks. Well here, the clearing firm defendants, who are acting in accordance with DTC procedures, received credits, net credits, that were due to their customers because of these due bills and put them in their account. It never had the right to go out and buy uranium stocks or lottery tickets or anything else. They did exactly what the process called for. So there can be no conversion. Now as I said, we don't need to get to the UCC provisions, but really the guts of that issue is, is it a financial asset? And I've got to tell you, I hated the UCC in law school and I'm not any more fond of it 40 years later, but what I'd like to do is just take a minute to walk the court through the definition of financial asset, which counsel alluded to is in Section 8-102A9. But what counsel didn't mention is that the first category of financial asset is a security. Now what CORE would have this court do is sever from a security the rights inherent in the security, and that's contrary to the plain language of UCC Section 102A9, because at the end of that section it says, as context requires, the term means either the interest itself or the means by which a person's claim to it is evidenced, including a security entitlement. A security entitlement in turn is defined under Section 8-102A17 as the rights and property interests of an entitlement holder with respect to a financial asset specified in Part 5, which again includes a security. It's as if CORE would have you take a hand, that's a security, and say we're going to sever from that security the fingers, the right to a dividend, in the case of a bond right to interest, in the case of these Coliseo shares, a due bill, which indisputably attached to the Coliseo shares when our customers purchased them. Now I'd be happy to walk through the provisions of 8-502 and 8-115 if the court would like, but frankly again I don't think there's really an issue regarding whether those statutes apply if in fact this court were to conclude, as I submit it should, that the due bill credits in cash were a financial asset. Your Honors, CORE is attempting to impose personal liability, and that's what we're talking about here. We're talking about they want a money judgment against the clearing of a bond. These areas operate in a highly regulated and automated market, which depends on instantaneous processing of transactions, millions of transactions every day. Here FINRA set the ex-dividend date, pursuant to which DTC then determined which shares would qualify for the due bill payments. It allocated those, per its procedures, to both CORE and to the clearing firm defendants, as well as others that are not before the court. They in turn did what they were required to do under the procedures. Afterwards, CORE asked . . . Can I just stop you, because you're bothering me. Sure. If your clients are liable, under whatever claim, leaving aside whether they would seek to recover it, what does that say about the liability of your client's customer? Well, Your Honor, frankly, if . . . Individual small investors who took a chance on these penny stocks. Fair question. Frankly, Your Honor, if we are held liable, we would have the right under our agreements to seek indemnity from our customers. Well, that's what I was thinking, that your liability means their liability. It very well could. What we're really hearing today is whether N&B should be able to recover from your client. Interestingly, I agree, and interestingly, Your Honor, Mr. Salas, the CEO of CORE, has said in the court below that if CORE does recover, they're not going to spend the money, which says something, I think, about whether they have an immediate right to possession. They're going to hold on to it because they know our customers are going to come out of the woodwork saying, wait a minute, that's our money. We bought the stock. It had the due bills attached. If it's not, that means it's the seller's money. I guess that's the other possibility, is they could pay it to the people who converted . . . Well, we're not going to strip all the intermediaries out of this and view it as a dispute between the buyers and sellers. Unfortunately, they're not before the court. No, they're not, but it seems to me it's not an unrealistic way to look at . . . I agree, and if they were, I would call that fight in favor of our customers, Your Honor, because it was Nobilis and Bofer that converted the shares, had them issued with the same I'm not sure what it was, but it was certainly them that put this process in motion and not us. As I said, I agreed to give Mr. Bolivar time. I'm concluded unless you have any questions. Thank you very much. May it please the court. My name is Gail Bolivar. I represent Signature Stock Transfer. I believe that there is an overwhelming amount of uncontested facts in this case to affirm the district court's actions in all regards. The district court made a very thorough, detailed examination of the facts, the law, and held as it did. First of all, I want to suggest that, as a simple matter, I think there's a lot of complexities here, but I like to try to look at it from a 30,000 foot view, if you will. And from that view, I would suggest this, that CORE failed in its fundamental industry responsibilities by opening the door to this fraud to the United States capital markets. It was its duty to ensure that that didn't happen. When it failed in its responsibilities to the US capital markets, it turned around and said, I want somebody else to be responsible for this. And where do I believe that responsibility comes from? Well, of course, in both of our briefs. Fundamentally, it's the securities laws, as has been further defined by FINRA, which published notice to members 0905 and the anti-money laundering requirements. Specifically for this particular case, we look at CORE's duty to discover shell companies. I think Mr. Salas said in his testimony, part of the appendix, during the receivership, that Colisio was a ghost company. That's his word. My word is, it was a shell company. It was their duty to discover that. It's an undeligable duty. 0905 itself says, you can't- Where will we go in federal law to find what you're calling a shell company, a definition? I mean, when they say it's a penny stock company, I have some idea to that, but I don't consider it a shell. So where do I go to differentiate between a penny stock company and what you're saying is a shell? A shell company, Your Honor, I believe is in 0905 that is a company without assets. And again, Mr. Salas agrees. He says it's a ghost company. It didn't have any assets. You see references there that owned a mining company. There's no evidence that CORE ever investigated it. It was their duty to investigate and determine what assets it had. We're reviewing the grant of summary judgment to your client on completely different issues. And you're asking us to remand, I guess, for a trial on your notion of who the bad guy really is. I'm asking you to affirm, actually. I'm asking you to affirm, and I'm outstanding at the first step. I haven't heard a word about why your client was the proper grant summary judgment. That's my next argument. So I wanted to start out by telling you why I think CORE didn't do its argument. Now, the second part of this discussion then is, what is the signature stock transfer's responsibilities? They're the transfer agent. What does FINRA say the transfer agent is? Part of the definition. The appendix says, their duty is to note the shares and the owners thereof. Stop, that's it. That was their responsibility. But they didn't take on that responsibility of their own. They had attorney opinions and corporate resolutions. Those fundamentals backed their obligation. They had a contractual obligation to do what they were asked to, which is list the shares and the owners thereof. That's all. They weren't asked to investigate the underlying firm. CORE was. CORE had an industry duty to investigate the underlying firm. Thus, how can you ever say that there's ever fraud, because we know the elements of fraud. Both of us set out those elements of fraud. Indeed, some of those require reliance. How can CORE say we relied upon UTA when two things, one, 0905 says you can't rely upon a transfer agent, another lawyer, etc., etc. Because CORE, that's your duty as the clearing firm. Keep in mind, CORE stops shares that should not be entered into the capital markets of the United States. They did not stop there. And so I suggest that there can be, never could be, any fraud brought against my client's signature stock transfer. Red flags were going up all over this particular- I only accept never. Okay, I would say never in this case. There's never been a stock transfer agent that stepped outside its intermediary role based on its relations with its customer, its client, like Felicio in this case, and participated in a fraud. It could be. There was a Nebraska case, but I think that's factually different. That's not what the FINRA transfer agent is obligated to do. It is obligated, you saw the definition in the materials. I'm sorry, thank you. Yeah, you can have two minutes because you can argue your SST claim right now if you want. It's been opened up for oral argument. I mean, it's preserved on the briefs regardless. It is, and just for clarification, I actually wanted to touch on something that Mr. Hargens had said, and it was actually in response to your question. I wasn't limiting your two minutes. Because I think, Your Honor, I was really getting down to an important question, which is who got defrauded in this particular situation? And I think at the end of the day, what happened is the issuer announced a dividend that it didn't make good on. I think the investors were the victims of the fraud here, and obviously, well, nobody celebrates fraud. I do think that that's where, that when you distill the transaction to what it is, is that the investors have been defrauded. There's no obligation for a securities intermediary, whether it's core or the brokerage defendants, to pay a dividend that they don't receive from the issuer. And so I think when you're trying to distill who has what role in this,  it's not just the brokers, it's the brokers themselves, and it's not just the brokers. Touching briefly also on the conversion point. The brokerage defendants are urging the court to adopt fraudulent conveyance law from other jurisdictions. But I think Nebraska Supreme Court law dealing with conversion, and in particular Zimmerman, is very clear here that they don't actually have to take possession of the securities in order to be liable on conversion. That it's really interfering with core's abilities. That's the essential element of conversion under black letter Nebraska law, and that's something that they indisputably did here. If there are no further questions, thank you very much. Thank you, Counsel. Very complicated case. You've done your best to educate us and certainly thoroughly briefed and helpfully argued it. We'll take it under advisement. Court will be in recess for 10 or 15 minutes.